UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| LOGAN DYJAK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 23-3170 |
| | ) |
| HARVEY DANIELS, JO-AN LYNN, STACEY HORSTMANN, AND JANE DOE, | ) ) ) |
| | ) |
| Defendants. | ) |

## SUMMARY JUDGMENT ORDER

Plaintiff, proceeding pro se and presently detained at Packard Mental Health Center (formerly known as McFarland Mental Health Center), brought the present lawsuit pursuant to 42 U.S.C. § 1983 alleging Fourteenth Amendment failure-to-protect and First Amendment retaliation claims. The matter comes before this Court for ruling on the Defendants' Motion for Summary Judgment. (Doc. 20). The motion is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**FACTS**

Plaintiff has been detained at Packard Mental Health Center ("Packard") since 2018. Defendants worked at the facility in the following capacities: Defendant Lynn was the Clinical Director of Monroe Hall; Defendant Daniels was the clinical nurse manager; and Defendant Hortstman was a psychiatrist. Each defendant was a member of the treatment team. Plaintiff has a history of filing lawsuits against officials at the facility. *See, e.g.*, *Dyjak v. Walker*, No. 21-CV-3249, ECF No. 64 at 5-7 (C.D. Ill., filed Mar. 11, 2025).

In May 2021, Plaintiff resided in Monroe Hall. Pl.'s Dep. 16:2. The living units in this area of the facility are locked, and residents have access to common areas that include a patio, lobby, conference room, cafeteria, gymnasium, classrooms, and shops based upon their respective privilege levels as determined by treatment staff. *Id.* 15:15-16:17. Monroe Hall is less restrictive than other areas of the facility. *Id.*

Plaintiff testified that, at some point in 2020 or 2021, a resident with the initials W.B. told him that he had previously physically assaulted another resident because the resident reported an incident that resulted in the revocation of W.B.'s privileges. *Id.* 19:5-18. Plaintiff did not interpret W.B.'s statement as a threat, nor did he become fearful of him after he made that statement. *Id.* 20:7-12.

On May 28, 2021, at approximately 5:00 p.m., Plaintiff and W.B. were involved in an altercation. Plaintiff testified:

> We were in the hallway outside of the café waiting to go into the hallway, and [W.B.] was verbally targeting one of the lower functioning patients, who's both intellectually disabled and blind. And I basically redirected him from targeting that patient to discussing it with me, in other words to protect that patient from

> harassment. Then he started verbally harassing me, and I tried to disengage with him on multiple occasions. And I tried walking away from him, and he followed me. And I continued to tell him that I was done with it. I didn't want to talk about it anymore, and at a certain point, he attempted to strike me with his fist. I saw it coming, and I deflected his fist. And then he called for staff complaining that I had touched him.

*Id.* 20:19-21:8. Plaintiff testified that W.B. admitted to staff that he had tried to hit him and he "basically told on himself because he was upset." *Id.* 21:18-20. Plaintiff did not file a complaint about the incident, but he told a nurse upon his return to his unit. *Id.* 23:17-19, 37:4-6.

The nurse summarized the incident as follows: "[d]uring the exchange of words it is reported that Mr. Dyjak stated 'fuck you bitch' to the peer which prompted the peer to swing his fist at Mr. Dyjak who grabbed the peer's wrists and stopped the attempt to strike him." (Doc. 20-2 at 2). The nurse stated further that the two residents later apologized. *Id.* Neither Plaintiff, nor W.B., lost privileges at that time. Pl.'s Dep. 36:19-21. Plaintiff testified that "everything went down as normal the rest of the day." *Id.* 23:10-12. None of the defendants were present during this incident. *Id.* 22:11-12.

On June 1, 2021, at approximately 11:30 a.m., Plaintiff and W.B. ate lunch at the same table. *Id.* 24:12. Plaintiff testified that an unidentified official called W.B. into the lobby, and "the next thing I knew…I was across the room…and had no idea how I got there…I didn't understand why there was blood, and I was stumbling around." *Id.* 24:17-22, 36:2-3. An incident report indicates that Plaintiff "was sitting in the dining room eating lunch when peer WB walked up and hit him 3 times in the face unprovoked." (Doc. 20-2 at 2). Plaintiff has no independent recollection of the attack. Pl.'s Dep. 25:22-24. He testified that several individuals told him that W.B. attacked him because officials had revoked W.B.'s privileges. *Id.* 24:24-25:12.

Plaintiff received medical treatment for his injuries, which medical staff documented as a "bloody nose/lip/mouth" that required "minor first aid." (Doc. 31-1 at 2). Plaintiff declined an x-

ray, pain medications, and officials' offer to take him to the emergency room despite his claims that he had a broken nose and a concussion. *Id.* at 5. The physician ordered "frequent observation" of Plaintiff for 24 hours. *Id.* at 6.

At approximately 2:30 p.m. the same day, Defendants Lynn and Daniels went to Plaintiff's room after a non-defendant official had observed Plaintiff throw a shoe at his roommate. (Doc. 20-2 at 2). Plaintiff reported that his roommate's shoe was on his paperwork, and he "threw it off the paperwork." *Id.* Defendants Lynn and Daniels "reminded [Plaintiff] to attempt to avoid altercations with other peers if possible, [and]…asked [Plaintiff] to keep distance from [W.B.] to avoid future altercations." *Id.* At or around that time, Defendant Horstman entered an order restricting Plaintiff to the unit. (Doc. 31-1 at 6). Plaintiff testified that Defendants Lynn and Daniels informed him of that after he had yelled at Defendant Lynn that she was not doing her job. Pl.'s Dep. 39:16-23.

Plaintiff testified that he does not recall seeing W.B. after the June 1st incident, and that W.B. was moved out of Monroe Hall the same day. *Id.* 42:14-25. Per Plaintiff's request, officials notified the Illinois State Police of the assault. (Doc. 20-2 at 2). Plaintiff provided a statement to a state trooper. (Doc. 31-1 at 4).

Defendant Lynn avers in her declaration that she did not learn about the May 28, 2021, incident until May 31, 2021, at the Monday morning meeting. (Doc. 20-9 at 2, ¶ 5). Her and Defendant Daniels state that they "were aware of W.B.'s history of physical aggression. But at the time relevant to this complaint, W.B. had been stable and not physically aggressive for a long period of time and that his previous unit had recommended transferring W.B. to a lower security unit." (Doc. 20-9 at 2, ¶ 6); (Doc. 20-10 at 2, ¶ 6). W.B. had not been physically aggressive since transferring to Monroe Hall. *Id.*

According to Plaintiff's treatment notes, he remained confined to the unit following several incidents that occurred after the June 1, 2021, attack: on June 11, 2021, Plaintiff made derogatory comments about a peer's appearance; on June 23, 2021, he was verbally aggressive towards staff; on June 27, 2021, Plaintiff's roommate threw coffee on him during an apparent dispute about Plaintiff monopolizing the bathroom; and, on July 1, 2021, officials found an unauthorized garden Plaintiff had been cultivating on the patio. (Doc. 20-2 at 1); (Doc. 20-3 at 2,4). Officials restored Plaintiff's privileges on July 8, 2021, only to reduce them again following several incidents in July 2021, including a bathroom dispute with his roommate, the use of derogatory language towards staff and peers, refusal to change the TV input back to its original setting after video game time, and taking a chair from a severely impaired peer and ignoring staff direction to return it. (Doc. 20-2 at 4).

## ANALYSIS

### Failure to Protect

Detainee claims alleging inhumane conditions of confinement arise under the Fourteenth Amendment's due process clause. *Hardeman v. Curran*, 933 F.3d 816, 821-22 (7th Cir. 2019). To prevail on a claim alleged failure to protect, a plaintiff must show that:

(1) [t]he defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, *even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved*—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Kemp v. Fulton Cty.*, 27 F.4th 491, 496 (7th Cir. 2022) (emphasis in original). The objective reasonableness inquiry "begins with the defendant's knowledge of the factual context and then

asks whether a reasonable officer with that knowledge would appreciate the risk of harm and still engage in the same conduct." *Davis v. Rook*, 107 F.4th 777, 781 (7th Cir. 2024).

Liability attaches only where the official "acted purposefully, knowingly, or perhaps even recklessly" when taking the actions at issue—negligence, or even gross negligence, will not suffice. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352-53 (7th Cir. 2018). Courts must afford deference to officials' decisions regarding the best ways to achieve legitimate penological goals. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).

Defendants knew at the relevant times that W.B. had a history of physical aggression, that officials in W.B.'s prior housing unit had recommended a lower security unit, and that W.B. had not been aggressive since he arrived at Monroe Hall. The record does not disclose that Defendants knew about the statements W.B. had allegedly made to Plaintiff about his motivations for previous attacks, that Defendants were otherwise aware of same, or that Plaintiff had had any previous issues with W.B. Defendants were not present during the May 28th incident, and the nurse's report for same disclosed that the two had reconciled without indication that unresolved issues remained.

A reasonable officer in Defendants' position could not have appreciated that the June 1st attack was likely based upon the available information, much less that W.B. would attack Plaintiff because his privileges had been reduced. Assuming Defendants knew about W.B.'s previous motivations, Plaintiff has not presented admissible evidence that links the attack to those motivations. Fed. R. Evid. 801; Fed. R. Civ. P. 56(c)(4) (sworn statements opposing summary judgment "must be made on personal knowledge [and] set out facts that would be admissible in evidence."). After the attack, officials closely monitored Plaintiff's medical

condition, Plaintiff does not recall seeing W.B. thereafter, and W.B. was transferred to another unit.

The record does not support a reasonable inference that Defendants acted unreasonably with respect to any risk of harm Plaintiff faced. The Court finds that no reasonable juror could conclude that Defendants violated Plaintiff's Fourteenth Amendment rights.

### Retaliation

To prevail on a retaliation claim, the Plaintiff must show that he engaged in activity protected by the First Amendment; he suffered a deprivation that would likely deter First Amendment activity in the future; and the First Amendment activity motivated the decision to take retaliatory action. *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018); *Bridges v. Gilbert*, 557 F.3d 541, 553 (7th Cir. 2009). The question of whether "retaliatory conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, [courts] can resolve the issue as a matter of law. *Douglas v. Reeves*, 964 F.3d 643, 647 (7th Cir. 2020). Once a plaintiff establishes a prima facie case of retaliation, "[t]he burden then shifts to the defendants to show that they would have taken the action despite the bad motive." *Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013).

The record is not entirely clear regarding the protected speech that Plaintiff alleges caused the alleged retaliation, and the fact that Plaintiff had previously filed lawsuits against these defendants is not sufficient to show an improper motivation absent evidence connecting the speech to the conduct. The closeness in time between Plaintiff's verbal statement that Defendant Lynn was not doing her job and Defendant Horstman's order reducing his privileges, on its own, is not sufficient to show the necessary causal connection between protected conduct and alleged retaliatory acts. *Manuel v. Nalley*, 966 F.3d 678, 681 (7th Cir. 2020) (suspicious timing is rarely

enough to create a triable issue). The record also lacks evidence that Plaintiff suffered a deprivation greater than a five-week lack of access to the common areas, which does not permit an inference that he suffered a deprivation likely to deter future speech. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness.").

Assuming Plaintiff could shift the burden, the record contains ample evidence that his privileges would have been reduced regardless of any protected activity. In the days leading up to Defendant Horstman's June 1st order, Plaintiff had been involved in an incident with W.B. and an incident involving his roommate and an airborne shoe. Plaintiff's refusal to go to the emergency room prompted medical staff to issue a 24-hour observation order, which likely required him to remain in areas where medical staff could find him. Plaintiff thereafter continued to engage in the same or similar conduct that warranted the restrictions in the first place, and, after his privileges had been restored, re-engaged in the same behavior. The record contains no evidence that the reduction in privileges after July 8, 2021, was related to the protected speech relevant to this case.

The Court finds that no reasonable juror could conclude that Defendants violated Plaintiff's First Amendment rights. *See Winston v. Fuchs*, 837 F. App'x. 402, 404-05 (7th Cir. 2020) (affirming entry of summary judgment where record showed motivation for discipline was inmate's violation of rules, not protected speech).

**IT IS THEREFORE ORDERED:**

1) **Defendants' Motion for Summary Judgment [20] is GRANTED. The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. All pending motions not addressed below are denied as moot, and this case is terminated.**

2) **If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues the Plaintiff will present on appeal to assist the court in determining whether the appeal is taken in good faith.** *See* **Fed. R. App. P. 24(a)(1)(c);** *see also Celske v Edwards*, **164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith.");** *Walker v. O'Brien*, **216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $605.00 appellate filing fee regardless of the outcome of the appeal.**

Entered this 8th day of September, 2025.

*s/Sara Darrow*
SARA DARROW
CHIEF U.S. DISTRICT JUDGE
